### R. C. Moore's Devisees v. R. C. Moore's Heirs.

**Witnesses—Credibility—Contradictory Statements.**

The credibility of a witness in the contest of a will is not destroyed by the testimony of other witnesses that the former made statements out of court, different from those made to the jury.

**Wills—Evidence—Testamentary Capacity.**

The evidence was held insufficient to show that the mind of testator was so far impaired at the time the will was made as to render the will invalid.

APPEAL FROM NICHOLAS CIRCUIT COURT.

December 7, 1872.

Opinion by Judge Lindsay:

The paper in contest was executed by R. C. Moore, deceased, on the 19th day of June, 1866.

The evidence in our opinion fails to show that its execution was procured by fraud, importunity or the exercise of undue influence. It is not shown that the will was made at the request of either one of the devisees, or of the friends of either of them. There is no evidence whatever conducing to establish that any person present when the will was made, or at any time prior thereto, so far possessed the confidence or affection of Moore as to be able to influence him to do any act involving important consequences, which his judgment did not approve, or his own inclinations or desires suggest.

The record fails to develop any reason why Dr. Phillips should have desired to influence the testator in disposing of his estate, much less to have become a participant in a conspiracy to contest and impose upon the courts as a will a paper that Moore did not execute at all.

That Carter desired that his daughter, and daughter-in-law and their children should be made the recipients of Moore's bounty, may be conceded, and yet it by no means follows from that fact nor from any other circumstance connected with the part played by him, in the execution of the paper, that he was guilty of the fraudulent and iniquitous conduct imputed to him by the appellees.

If Carter and Phillips are to be believed, Moore in making the will acted freely and voluntarily, and the paper before us is his true

lawful will and testament. The attempts to show that their two witnesses are not entitled to be believed can not be regarded as successful; that they differ in their testimony as to immaterial facts and circumstances, is rather to be attributed to the frailty of human recollection than to corruption, and if they had closely and minutely agreed in everything it might well have been suspected that their perfect consistency was the result of conspiracy and fraud.

Nor is it enough to destroy their credibility that certain witnesses swear that they made statements out of court different from the testimony detailed by them to the jury.

It is evident that the capacity of Moore to make a will and the circumstances attending its execution, have been extensively canvassed among the friends and acquaintances of these litigants. The great number of witnesses examined, and the partiality exhibited by many of them, demonstrates that it was a matter of feeling with many persons in no wise interested.

Under such a state of case it might well be expected that the conversations or remarks of these two important witnesses to making this theme of local interest would be misunderstood or misconstrued by the partisans or friends of the contestants of the will. Besides this the importance of some of these supposed contradictory statements depends upon the time at which they were made and it is manifest that it was next to impossible that these dates should be correctly fixed. The character of neither of these witnesses was assailed, and their credibility remains in our judgment unimpaired, notwithstanding the labored efforts of appellees to destroy it.

It only remains to consider the question of testimentary capacity. In the latter part of May, when Dr. Bigstaff ceased to visit Moore, he expressed the opinion that he could get along without further medical attention, Dr. Thompson did not discover that his mental powers were even enfeebled, for twenty or thirty days after he came to James F. Glovers, which was on the 28th or 29th of May.

At the consultation of the physicians, held the day before or the day after the will was executed, no mention was made by any or either of them, not even by Dr. Bigstaff, that the mind of the patient was at all affected. It can scarcely be possible that these scientific gentlemen whose business it was to examine the sick man and to ascertain if practicable the character of the disease with which he was suffering, could have failed to discover that his mental

powers were impaired if such had been the fact. They must have conversed with him freely and fully concerning the symptoms of his malady and as a matter of necessity their conclusions were to a greater or lesser extent based upon information then obtained from him.

Bigstaff says that he before that time had an intimation that Moore was guilty of the practice to which he attributed the supposed softening of the brain. As a physician he knew that such practice results in derangement of the mental faculties, and he would naturally have turned his attention to the condition of the patient's mind as one of the means by which to ascertain the nature of the disease for which he was called upon to prescribe. The failure of these educated physicians to discover insanity upon this occasion, fortified as this circumstance is by the positive testimony of an intelligent man like Payne, who remained with him during the night of the 19th of June, effectually disposes of the vagaries of Coons and wife, and of Moxley and Steele.

Answering all the evidence we conclude that the mind of Moore became gradually enfeebled as the disease preyed upon his physical powers, but that the finding of the jury that his intellect was so far impaired on the day the will was executed as to render him incapable of making a will is not only not sustained by the testimony, but is against the weight of it.

The paper shows upon its face evidences of testamentary capacity, sufficient to rebut any presumption of incapacity that might arise from the testimony offered by the contestants. It was made pursuant to a design previously entertained and expressed.

If upheld it accomplishes ends proved to have been contemplated by the testator when his mind was sound beyond question. In providing a monument to mark his grave, and in keeping his estate or any part of it out of the hands of certain of his kindred, it manifests that he had not forgotten his old friend Lloyd Moore, whose name and family had almost ceased to be remembered by any one else, and demonstrates that the affection he had so often exhibited for his little grand-nephew, Charley Glover, was genuine. It provides that none of his relatives shall be required to pay the notes he held against them, and secures to the orphan whom the testator had raised and his children by the wife he knew and who had doubtless been kind to him, more than one-half of his estate. The remainder

is divided between the brothers and sister of this nephew, who, like him, were left orphans and were brought from a distant state to Kentucky by this bachelor uncle.

The will shows that the testator was familiar with the character, amount and condition of his estate, and when considered in conjunction with the memorandum made at the same time, demonstrates beyond cavil that the testator's memory could not have been seriously impaired. It is, therefore, considered that the judgment of the Nicholas Circuit Court founded upon the verdict of the jury be reversed, and the cause remanded with instruction to said circuit court to enter a judgment affirming the judgment of the Bath County Court admitting the will to probate, and to certify that fact to said last named court.

*Wadsworth, Jno. M. Elliott, E. C. Phister, Apperson & R. C. W. Andrews, R. Reid, for appellant.*

*J. S. Hart, T. Turner, Stone, Nesbitt & Gudgell, Jno. B. Huston, Breckenridge & Buckner, for appellees.*